Filed 1/13/22  In re E.S. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re E.S., a Person Coming Under the Juvenile Court Law. | B310318 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP02604) |
| Plaintiff and Respondent, | |
| v. | |
| K.D. et al., | |
| Defendants and Appellants. | |

APPEAL from findings and order of the Superior Court of Los Angeles County, Emma Castro, Juvenile Court Referee. Affirmed in part and dismissed in part.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant K.D.

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant K.S.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Mother K.D. and Father K.S. appeal from the juvenile court's jurisdictional findings and removal order regarding their minor child E.S. Mother and Father contend the evidence was insufficient to support the jurisdictional findings. They further contend there was insufficient evidence that removing E.S. from his parents' custody/care was necessary to protect him from a substantial risk of harm. Father additionally contends reversal is required because the juvenile court failed to provide a factual basis for its findings and orders preventing meaningful appellate review.

We conclude substantial evidence supports the juvenile court's jurisdictional findings and dismiss as moot the portion of Mother's and Father's appeal of the order removing E.S. from Mother's and Father's care.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Events Leading to Dependency Jurisdiction*

On April 21, 2020, three-month-old E.S. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) when the child protection hotline received a referral alleging general neglect. Per the referral, E.S. moved with his family from Texas to California shortly after the following incident. On April 6, 2020, Mother and Father took E.S. to the doctor; Mother disclosed to the doctor that she checked on E.S. at 5:30 a.m. and noticed he "was not using his left arm." The doctor discovered that E.S.'s left clavicle was broken and the "injuries were from something significantly happening to the child to cause such injury."

2

In Los Angeles County, a children's social worker (CSW) made an unannounced visit to E.S.'s home to investigate the allegation of general neglect. The paternal grandmother (PGM) was present at the home. PGM told the CSW she "does not believe that [M]other and/or [F]ather would do anything to hurt [E.S.]." PGM described Mother and Father as "new and young parents" who are "doing well" and learning "new parent[ing] tips." PGM explained that Mother and Father lived in Texas and attended school together in Texas, but recently moved back to California due to the COVID-19 pandemic.

The CSW next interviewed Father. Father said when he and Mother woke up one morning and noticed E.S. was not using his left arm like he normally does, they consoled him and then took him to the doctor. X-ray results showed E.S. had a fractured clavicle. They were given a bandage and told to wrap his arm in it. E.S. also had vitamin D deficiency and was given vitamin D drops. Father reported he uses marijuana and/or eats edibles a few times a week when he is not caring for E.S. Father told the CSW that he and Mother "would not do anything intentionally to hurt" E.S.

The CSW then traveled to maternal grandmother's (MGM) home to interview Mother. The CSW observed E.S. smiling and comfortable in the care of his family. Mother told the CSW she is currently taking business classes online. Regarding E.S.'s injury, Mother stated she is "not sure what happened." She recalled giving E.S. a bath the night preceding the incident. She then fed him and played with him before swaddling him and putting him to bed. "Everything was fine." Then, at about 5:30 a.m., she woke up to feed E.S. and realized E.S. cried in pain when she

moved his arm. Mother said the doctor told her E.S.'s vitamin D deficiency "could be the reason for the break."

DCFS investigated the family's welfare history in Texas and discovered that when E.S.'s parents took him to the doctor's office, the treating doctor had "concerns about the injury because there is a lot of force needed to sustain an injury of that nature." The investigating CSW from Texas informed DCFS they found a marijuana grinder in the parent's home, although both parents denied substance use. The CSW from Texas told DCFS "the issue is that there is no real explanation as to how the injury occurred."

On April 27, 2020, the CSW spoke with Dr. Katherine Canty, who reported "there are some concerns with the type of injury that [E.S.] obtained." Dr. Canty opined it is "unlikely" the injury happened accidentally to three-month-old E.S. Per Dr. Canty, there would have to be "direct force/contact or squeezing" to that area to cause such an injury; low vitamin D levels did not increase the risk of fracture to a child at this age. E.S. did not show signs of osteopenia or weak bones. E.S. was observed as having "elevated levels of ALT and AST in the liver that could indicate some type of trauma to the child."

On April 28, 2020, Father told the CSW he no longer wanted to test for drugs. DCFS expressed concern whether Father's "marijuana use impedes on his ability to provide and care for his child as he declined to submit to an on demand drug test." DCFS believed there was a "high risk" of physical abuse and general neglect as E.S. sustained a left clavicle fracture without a clear explanation as to what caused the injury.

4

On April 30, 2020, Mother was interviewed again. She explained she recalled the following event. On April 4 or 5, 2020, E.S. was crying while swaddled in his crib. When Mother picked E.S. up, he "was slipping" out of her grip so she grabbed him to prevent him from falling. She described grabbing E.S.'s "shoulder area more tightly."

On May 6, 2020, the juvenile court authorized removal of E.S. from Mother's and Father's care, and placed him in DCFS's care.

B.    *Petition and Detention*

On May 11, 2020, DCFS filed a petition on E.S.'s behalf pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b).[1] The petition alleged: On April 6, 2020, three-month-old E.S. was medically examined and found "to be suffering a detrimental and endangering condition consisting of an acute minimally displaced and angulated fracture of the child's left clavicle at the junction of the middle and lateral thirds." Mother and Father "gave no explanation" as to how E.S. sustained the injury, which is "consistent with physical abuse." Such injury would not occur except as the result of "deliberate, unreasonable and neglectful acts" by E.S.'s parents. Such deliberate, unreasonable, and neglectful acts by E.S.'s parents endangered his physical health, safety, and well-being, created a detrimental home environment, and placed him at risk of serious physical harm/danger.

At the detention hearing on May 14, 2020, the juvenile court found K.S. to be E.S.'s father. The juvenile court found a

---

[1]    All statutory references are to the Welfare and Institutions Code, unless otherwise stated.

5

prima facie case for detaining E.S. The court found there are no reasonable means by which the child's physical and emotional health would be protected without removing him from the custody of his parents, and ordered his removal. The court approved releasing E.S. to the care of maternal great-grandmother (MGGM). The court ordered monitored visits for Mother and Father and gave DCFS discretion to allow overnight visits.

C.    *Developments during Dependency Proceedings*

On May 22, 2020, Father reported Mother had told him when E.S. "was getting out of the tub, he was fighting [Mother] and he kind of slipped out of her hands." Father said both he and Mother "did not think anything of it" and swaddled E.S. and put him to sleep.

On June 30, 2020, MGGM reported Mother had informed her that E.S. "got hurt" because she "almost dropped the baby or something." MGGM expressed concern because the parents "are not ready to have a child" as she has observed the parents not "do what parents should do."

On July 8, 2020, the CSW received a phone call from MGGM, who reported Mother was crying when she arrived for her visit with E.S. Mother left shortly after Father arrived, and returned once Father left. The CSW received a phone call from Mother asking for the visits to be separate. The CSW decided Mother's and Father's visits should be separate effective immediately.

Mother provided DCFS with a letter indicating she completed 18 sessions of a parenting class. Father provided a certificate of completion for 12 sessions of Project Fatherhood. Per MGGM, Mother's and Father's visits with E.S. were

6

"consistent." Mother interacted with E.S. "by feeding him, giving him his daily bath, and playing with him." Father played with E.S., bathed and fed him. E.S. was reported to be "happy and very calm" during visits.

On September 24, 2020, Mother reported to the CSW an additional incident from April 5, 2020 and clarified the April 4 or 5, 2020 incident previously reported, as follows: Between 2:00 a.m. and 3:00 a.m. on April 4 or 5, 2020, Mother woke up because E.S. "was crying a little more than usual" and went to check on him. She tried to breastfeed him and gave him a bottle, but he continued to cry. She gave him a pacifier and walked around carrying him until he fell asleep. While placing E.S. in his crib, he "started slipping from her grip" so she grabbed E.S. between his shoulder and elbow and "put a little more grip on him to prevent him from falling." Mother reported E.S. did not cry but was "a little startled." She washed E.S. and he went to sleep 30 minutes later. Mother additionally reported that while giving E.S. a bath between 7:00 and 8:00 p.m. on April 5, 2020, "he started slipping out of her grip" so she "grabbed him from under his armpits." She stated that E.S. "did not cry" and "went to sleep normally" thereafter.

DCFS provided the court with a letter from Dr. Canty, a board-certified pediatrician and a fellow in child abuse pediatrics. Dr. Canty opined that a clavicle fracture in a non-mobile infant like E.S. is "highly suspicious for child physical abuse." Dr. Canty believed it unlikely that Mother's tight squeezing of E.S.'s shoulder on April 4 or 5, 2020 caused the fracture as Mother said he neither cried nor had any alteration in his behavior following that event. It was her opinion that E.S.'s "clavicle fracture is most concerning for inflicted injury and child physical abuse."

Dr. Canty also "expressed concerns regarding the elevations in the AST and ALT, which suggest liver injury and can be seen with blunt abdominal trauma."

D. *Adjudication*

The adjudication hearing took place on the following dates: November 20, December 1, 2, 8, 14, and 15, 2020. The following relevant testimony was elicited:

<u>Dr. Thomas Grogan</u>

Dr. Thomas Grogan was deemed qualified to testify as an expert in pediatric orthopedics. Dr. Grogan opined that in a child of this age, an injury of this kind typically occurs from a "compression" of the shoulder towards the midline of the body rather than a blunt force. He believed if Mother's "almost losing grip on" E.S. caused her to tighten her grip on him, that may cause a compression force "consistent with the injury." "[S]queezing of the child would produce a compressive force across the clavicle to cause this fracture to occur." Additionally, consistent with the increased ALT and AST levels in E.S., Dr. Grogan testified "it's very likely that squeezing the child enough to cause 40 or so newtons of force to the clavicle is also going to release liver enzymes." Dr. Grogan reviewed Dr. Canty's letter and "agree[d] with half" of it—he disagreed that the clavicle fracture could have been caused by "a direct blow" and instead agreed the fracture could have happened by "squeezing" the area. He "expected the child to cry" when the fracture happened because "[f]ractures hurt. Children cry." "It would be unusual for a child not to cry with a fracture. I don't know if I've ever seen a child not cry with a fracture."

8

<u>Dr. Katherine Canty</u>

Dr. Katherine Canty was deemed qualified to testify as an expert in child abuse pediatrics and expert diagnosis of suspected child abuse. She testified she examined E.S. on April 6, 2020 and felt "an area on the left clavicle that was slightly protuberant . . . [and] bulging out." The skeletal survey showed "a healing fracture of his left clavicle." Dr. Canty opined that in "nonmobile children" like E.S., "the primary mechanism by which a clavicle fracture occurs is either through forces applied to the shoulder, such as forceful squeezing or compression at the shoulder, or from local impact to the clavicle such as when a child is either thrown or slammed against a solid object." She believed the fracture happened within a seven-day period before her examination of E.S. on April 6, 2020. When she interviewed Mother about the cause of the fracture, Mother could not explain how it happened. The first Dr. Canty heard of Mother's assertion that she tightly squeezed E.S. between 2:00 a.m. and 3:00 a.m. on April 4 or 5, 2020 was upon reading the jurisdiction/disposition report submitted by DCFS. However, Dr. Canty did not believe Mother's explanation was consistent with a clavicle fracture because E.S. did not have any reaction to the injury. "I would expect an infant with a fracture to exhibit pain symptoms . . . [such as] affective crying and fussiness." "[I]t would be obvious to a caregiver both at the time that the injury happened and then, with normal observation, a pattern of discomfort . . . [and] some kind of awareness that the child was in pain or had some kind of injury." She concluded: "[I]n the absence of characteristics that I feel would be typical of an infant's reaction to pain, without those characteristics, I do not feel that the history provided is consistent and can explain [E.S.'s] fracture; and, therefore, in the

9

absence of any alternative explanation, his injury is most consistent with inflicted trauma or child abuse." While Dr. Canty believed Mother's explanation that E.S. possibly sustained the fracture when she grabbed him as he slipped from her grip is "plausible," she found it "concerning that the mother took so long to provide that history." Finally, Dr. Canty explained that a low vitamin D level "has not been associated with increase in fractures."

Mother

Mother testified at length. She recalled giving E.S. a bath on the night of April 5. At some point he slipped from her grip, and she "tried to grab him from under his armpits, but nothing happened." E.S. "fell back into the tub." She took him into the bathroom, put lotion and clothes on him, swaddled him, and put him to sleep. Mother heard E.S. crying at 2:00 a.m., went to check on him, and soothed him until he slept. She heard E.S. cry again and be fussier than normal at 5:00 a.m. Around 10:00 a.m. on April 6, 2020, Mother noticed E.S.'s arm wasn't moving when she took him out of his swaddle. They immediately called the doctor and made an appointment for 2:00 p.m. that same date.

Mother could not explain why she told the CSW that this incident happened on either April 4 or 5, 2020, instead of the actual date—April 6, 2020. When asked why she did not report E.S. slipping out of her grip to the treating doctor on April 6, 2020, Mother said she "was in shock" and "couldn't piece together like how it could have happened, at that time." When asked why she did not report the incident to the CSW in Texas, she testified that none of the social workers asked her what happened to E.S.

<u>Father</u>

Father testified that Mother called the doctor around 10:00 to 11:00 a.m. on April 6, 2020 when they realized E.S. was not moving his arm normally. Father never asked Mother if something happened the night before because nothing seemed out of ordinary and there were no issues. He recalled Mother gave E.S. a bath on the evening of April 5, 2020, and that he swaddled him before E.S. fell asleep. He never questioned Mother about how E.S. was injured. Father had not heard E.S. wake up during the night.

<u>Dr. Janet Arnold-Clark</u>

Dr. Janet Arnold-Clark, a board-certified general pediatrician and board-certified child abuse pediatrician, was found by the court to be an expert in the area of general and child abuse pediatrics as well as an expert in the diagnosis and treatment of suspected child abuse. She testified the type of force required to cause this type of injury is "abusive force [or] at least more force than would be seen in normal handling." She explained how clavicle fractures are one of the most common accidental injuries in children who are able to move on their own; but for a three-month-old child who is not mobile, the two causes for such an injury are "a direct blow to a shoulder" or "squeezing."

Dr. Arnold-Clark opined that "an injury with enough force to cause a fracture would be a very significant event. And after that significant event, the child would immediately cry, would immediately show distress; and from that point on would be in pain whenever the arm is manipulated or the area was touched." She said that "every time you change a onesie in a three-month-old if they have a fracture, the baby will cry and be fussy. And that will let the family know that they need to seek care." She

11

explained the history that E.S.'s parents provided initially, i.e., that the child acted normally afterwards and did not show any signs of pain until the morning of April 6 was not consistent; "it would have been such a memorable event . . . [i]t would've been something you would've been able to provide that history at the time to the doctors."

Dr. Arnold-Clark concluded: "My medical opinion is that it is most likely that an event happening a few days before where the child slipped and was grabbed is not a sufficient mechanism to explain this fracture. [¶] . . . [A]nytime you have an unexplained fracture in a three-month-old, the most likely thing is that it's an abusive fracture." She was concerned that the elevated liver enzymes in E.S. were caused by "trauma, since the child also had a fracture, that at the time, at least, did not have a good history to explain."

<u>Dr. Marvin Pietruszka</u>

Dr. Marvin Pietruszka, board-certified as a forensic toxicologist with extensive training in pediatric pathology, was found by the court to be an expert in the areas of pathology and forensic toxicology. He believed "the reduced level of vitamin D played an important role in reducing the strength of the clavicle and the thickness of the clavicle, and made it easier for the clavicle to fracture when the child was grabbed by the mother." He opined that the history provided by Mother is a "plausible explanation" of E.S.'s injury. He also explained how it "is not unusual to find elevated liver function" in newborns in response to immunizations/vaccines that are administered to newborns, like E.S.

The juvenile court continued the adjudication hearing for its decision and ordered DCFS to provide an update on the parents' progress. The juvenile court ordered DCFS to provide Father with referrals for individual counseling and on-demand drug testing. Mother was ordered to attend individual counseling.

DCFS also reported to the juvenile court that Father indicated he "would not submit to random testing whenever DCFS requested but would test this time to prove that he was clean." Father submitted to an on-demand drug test on December 22, 2020 and tested positive for marijuana. As for Mother, DCFS reported having requested proof of Mother attending individual counseling, but did not receive any verification from her. DCFS otherwise reported to the court that both parents' visits with E.S. have been consistent and appropriate. Mother fed E.S. and played with him until his nap time. Father would "bond with the child by playing with him, bathing him, and dressing him."

E.    *Disposition*

On January 4, 2021, the juvenile court proceeded to disposition. It sustained the allegations in the petition and declared E.S. a dependent of the court under section 300, subdivisions (a) and (b). The court found by clear and convincing evidence pursuant to section 361, subdivision (c), that substantial danger to the physical health, safety, and emotional well-being of E.S. existed and there were no reasonable means by which E.S.'s physical health could be protected without removing E.S. from his parent's home. The court ordered E.S. removed from their custody and care and placed with a relative under the supervision of DCFS.

13

The court expressed concern about "mov[ing] to an unmonitored and/or overnight visit for the parents [because] there is missing information that the court is concerned about in terms of child's safety issues." The court also expressed concern about MGM's statements "at the onset of this case regarding her distrust, frankly, of the parent's ability to appropriately parent this infant." The court found Father "reticent to provide information" and "hostile" in his responses during testimony. The court commented that Father took only one drug test and it tested positive for marijuana; the court also noted having observed Father falling asleep or closing his eyes for long periods of time during the last two court hearings via Webex. As for Mother, the court commented that although it "made orders that allowed for more frequent visits," Mother had not been seeing her child more often.

Finally, the court stated it would "write a written ruling to support [its] orders."

On January 8, 2021, the court held a hearing "for the court's written ruling and the signing of the parent[s'] case plans." DCFS was ordered to provide family reunification services to E.S. and his parents.

The court-ordered case plan for Father and Mother included parenting classes, individual counseling with a licensed therapist to address case issues, and infant mental health services such as child-parent psychotherapy with E.S. Father was additionally ordered to submit to on-demand consecutive drug tests upon objective signs of drug use, including marijuana. The court ordered monitored visitation for two hours twice a week, and gave DCFS discretion to liberalize visitation.

Mother and Father filed notices of appeal.

14

F.    *Post-Notice of Appeal Events*

On July 22, 2021, DCFS filed a motion to dismiss a portion of the appeal, contending Mother's and Father's challenge to the juvenile court's removal order is moot.  DCFS requested us to take judicial notice of the minute order dated July 7, 2021 where the juvenile court terminated its suitable placement order and ordered E.S. to reside with his parents.  We take judicial notice of the July 7, 2021 minute order per Evidence Code sections 452, subdivision (d), and 459.  We address the merits of DCFS's motion to dismiss below.

## DISCUSSION

First, Mother and Father argue insufficient evidence supported the juvenile court's jurisdictional findings.  Second, Mother and Father argue the juvenile court's removal order was improper as there was insufficient evidence that E.S. could not be protected with a less restrictive alternative.  Finally, Father argues the juvenile court's failure to give a factual basis for its findings and orders prevents meaningful appellate review, warranting reversal.

A.    *Substantial Evidence Supports the Court's Assertion of Jurisdiction Over E.S.*

1.    Standard of Review

In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings and related dispositional orders, we "consider the entire record to determine whether substantial evidence supports the juvenile court's findings." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773.)  When an appellate court reviews a sufficiency of the evidence challenge, we may look only at

15

whether there is any evidence, contradicted or uncontradicted, which would support the trier of fact's conclusion. (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212.) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)

In making our determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court. We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; see *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["[w]eighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court"].) "Evidence from a single witness . . . can be sufficient to support the trial court's findings." (*In re Alexis E.*, at p. 451.)

2.    Applicable Law

Section 300, subdivision (a), authorizes a juvenile court to exercise jurisdiction over a child when the child has suffered, or there is a substantial risk the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent. (§ 300, subd. (a).) A court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child, or a combination of these and other actions

16

by the parent that indicate the child is at risk of serious physical harm. (*Ibid*.)

Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child, or . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).) A jurisdictional finding under section 300, subdivision (b)(1), requires DCFS to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness. (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; see also *In re R.T.* (2017) 3 Cal.5th 622, 624.)

3.   Analysis

Mother challenges the sufficiency of the evidence supporting counts a-1 and b-1.

We begin with count a-1, which alleges that E.S.'s fractured clavicle would not have occurred except as a result of "deliberate, unreasonable and neglectful acts" by E.S.'s parents.

Mother contends, and Father joins, that the evidence was insufficient that E.S. did or would suffer serious physical harm inflicted nonaccidentally upon him by his parent. Mother argues she gave "a plausible explanation as to the manner in which E.S. sustained his injury" and that the experts "did not agree that his injury would not occur except as the result of deliberate,

17

unreasonable and neglectful acts by the parents." We disagree.

There was evidence that a three-month-old non-mobile newborn suffered physical harm/injury—a left clavicle fracture—while in the custody, care, and control of his parents. For weeks the parents had no explanation for the injury, until Mother recalled on April 30, 2020 the slipping incident in the crib where she grabbed E.S. tightly to prevent his fall. Mother then recalled on September 24, 2020 another slipping incident in April 2020 where E.S. nearly slipped from Mother's grip during bath time. As Dr. Canty, Dr. Arnold-Clark, and Dr. Grogan testified, Mother's statements as to what happened were inconsistent. If E.S.'s clavicle was fractured during the slip/grab incident in the bathroom, Mother would have known right then and there that something was wrong with E.S. or that he was in pain. Dr. Grogan testified, "It would be unusual for a child not to cry with a fracture. I don't know if I've ever seen a child not cry with a fracture." Dr. Canty did not believe Mother's explanation was consistent with a clavicle fracture because E.S. did not have any reaction to the injury. "I would expect an infant with a fracture to exhibit pain symptoms . . . crying and fussiness." Similarly, Dr. Arnold-Clark opined that "an injury with enough force to cause a fracture would be a very significant event. And after that significant event, the child would immediately cry, would immediately show distress; and from that point on would be in pain whenever the arm is manipulated or the area was touched." However, even during her testimony during adjudication, Mother repeated and maintained that "nothing happened" after she grabbed onto E.S. tightly, and that he did not cry or fuss until 2:00 a.m. later that evening.

The inconsistency in Mother's explanations as to what happened are troubling. She related one event where E.S. slipped from her grip between 2:00 and 3:00 a.m. on April 4 or 5, 2020, and another instance where E.S. nearly slipped from her grip during bathtime on April 5, 2020, causing her to grab his shoulder area "more tightly." When asked why she did not inform the doctors about these events until weeks later, Mother testified that none of the social workers asked her what could have happened to E.S. At some point, she blamed E.S.'s vitamin D deficiency as the reason for the break. Thus, while Mother argues on appeal that she gave a "plausible explanation" as to how E.S. sustained the injury, we find her statements still do not add up, as she maintained E.S. did not cry during either slipping incident, a very unusual reaction.

Dr. Canty testified, and Dr. Arnold-Clark agreed, that "in the absence of characteristics that I feel would be typical of an infant's reaction to pain, without those characteristics, I do not feel that the history provided is consistent and can explain [E.S.'s] fracture; and, therefore, in the absence of any alternative explanation, his injury is most consistent with inflicted trauma or child abuse." That alone is enough to sustain the allegations in count a-1.

Contrary to Mother's assertion, the experts need not agree that E.S.'s injury would not have occurred but for unreasonable and neglectful acts by the parents. It is within the province of the juvenile court to assess conflicting evidence and make findings. That some evidence may support a different conclusion is of no importance when other evidence substantially supports the findings made by the juvenile court. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

Based on the foregoing, we conclude substantial evidence supports the juvenile court's jurisdiction.

Where, as here, " 'a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) Thus, "a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction and render moot a challenge to the other findings." (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.) In such cases, we need not consider whether the other alleged grounds for jurisdiction are supported. (*In re Alexis E.*, *supra*, 171 Cal.App.4th at p. 451.) We thus need not address the allegations in count b-1.

B. *The Appeal of the Juvenile Court's Removal Order is Dismissed.*

We first address DCFS's motion to dismiss the portion of the appeal that challenges the removal order because the juvenile court terminated the suitable placement order and returned E.S. to the home of his parents while this appeal was pending. DCFS contends that portion of the appeal is moot as we can no longer offer any effective relief.

When no effective relief can be granted, an appeal is moot and will be dismissed. (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315–1316.) The duty of this court is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the

20

matter in issue in the case before it.  (*Id.* at p. 1316.)  When, pending an appeal from the judgment of a lower court, and without any fault of the respondent, an event occurs which renders it impossible for this court to grant appellant any effectual relief, the court will not proceed to a formal judgment, but will dismiss the appeal.  (*Ibid.*)

Still, a court may exercise its inherent discretion to resolve an issue when there remain material questions for the court's determination, where a pending case poses an issue of broad public interest that is likely to recur, or where there is a likelihood of recurrence of the controversy between the same parties or others.  (*In re N.S.* (2016) 245 Cal.App.4th 53, 59.)

Mother and Father did not oppose DCFS's motion to dismiss.  Nevertheless, Father argues in his reply brief, joined by Mother, that "the findings themselves are prejudicial to [them] even though E.S. is back in their care."  Father argues "E.S. is young and will remain a minor for another 16 years and the parents may end up having more children in the future. . . .  Thus, it is possible there could be future juvenile or family court actions in which the . . . findings could prejudice the parents."  Those two sentences, without further explanation, are the only opposition and argument provided against dismissal.  This is not enough.

During the pendency of this appeal, E.S. was returned to Mother's and Father's care and they have received the relief they sought as to removal.  It is impossible for this court to grant effective relief when the child has been returned to the parents' custody and care.

21

Based on the foregoing, we decline to exercise our discretion to review the juvenile court's removal order. Thus, we grant DCFS's motion to dismiss as moot Mother's and Father's portion of the appeal challenging the removal order.

C.    *Father's Additional Argument*

Father argues the juvenile court "repeatedly assured the parties that it would issue a 'written ruling to support' its orders" but "despite these representations . . . did not subsequently file a written ruling." He argues the court's failure to provide "a factual basis for its orders and rulings" prevents meaningful appellate review and requires reversal. He cites to *In re Podesto* (1976) 15 Cal.3d 921, where the Supreme Court "emphasized that meaningful judicial review is often impossible unless the reviewing court is apprised of the reasons behind a given decision." (*Id.* at p. 937.)

Section 356 provides, in relevant part: "After hearing the evidence, the court shall make a finding, noted in the minutes of the court, whether or not the minor is a person described by Section 300 and the specific subdivisions of Section 300 under which the petition is sustained. . . . If the court finds that the minor is such a person, it shall make and enter its findings and order accordingly." (§ 356.) Here, the juvenile court found by a preponderance of the evidence that E.S. is a child described by section 300, subdivisions (a) and (b)(1). The court also found clear and convincing evidence pursuant to section 361, subdivision (c), that substantial danger to the physical health, safety, and emotional well-being of E.S. exists and that there are no reasonable means by which E.S.'s physical health can be protected without removing E.S. from his parent's home. It expressed concern about changing the monitored visitation order

22

to unmonitored.  It referred to MGGM's statements about her distrust of the parents' ability to appropriately care for E.S.  It found Father hostile in his responses during his testimony.  Before making its ruling, the juvenile court stated it had the opportunity to review the exhibits and consider all the testimony.  We find the foregoing to be sufficient.  The juvenile court's failure to provide written factual findings after the hearing (in addition to the minute order) does not require reversal.

## DISPOSITION

The juvenile court's jurisdictional findings are affirmed; Mother's and Father's appeal of the removal order is dismissed as moot.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, J.

We concur:


GRIMES, Acting P. J.


HARUTUNIAN, J.[*]

---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

HARUTUNIAN, J., Concurring in the result.

I fully concur with the majority opinion, with the exception of Section B's dismissal of the appeal of the removal order on the grounds of mootness. In my view, the parents adequately preserved the issue, despite DCFS's motion to dismiss, by briefly arguing the removal order could be prejudicial to them in future juvenile or family court proceedings. I believe the future prejudice (and potentially unwarranted stigmatism) of being adjudicated by a juvenile court as being unfit to care for your child for a period of time is self-evident.

My colleagues properly recognize that we have the discretion to review the removal order. Courts in the past have recognized that even "speculative" concerns from a parent in a dependency case about a "moot" issue do not necessarily mean the court should not consider the issue, because dismissal of the appeal operates as an affirmance of the underlying order. (See *In re C.C.* (2009) 172 Cal.App.4th 1481, 1488–1489.) Generally speaking, I believe parents should "have their day in court" when seeking to overturn an adjudication that they were "unfit." They should be entitled to have us review whether the claim they were unfit was unsupported by sufficient evidence. They should not be left to wonder whether the "stain" on their parental reputation would have been removed if the court had reviewed the issue on the merits.

1

Having said that, this is not a case where the removal order should be overturned.  We should address their claim that removal was improper, and find, on the merits, the trial court's removal order was fully justified by the record.


HARUTUNIAN, J.[*]

_____

[*]     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.